FILED    ENTERED
LODGED    RECEIVED

OCT 23 2018

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

FILED UNDER SEAL

NO.

**UNDER SEAL**

SEA093019

FILED ___ ENTERED
___ LODGED ___ RECEIVED

OCT 23 2018 GT

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

FILED IN CAMERA, UNDER SEAL UNTIL FURTHER ORDER OF THE COURT, 31 U.S.C. §§ 3730(B)(2).

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

UNITED STATES OF AMERICA, *ex rel.*, RAJU A.T. DAHLSTROM,

Plaintiff,

v.

SUNRISE SERVICES, INC., a Washington Corporation,

Defendant,

LIFE CARE CENTERS OF AMERICA, Inc., a Tennessee Corporation,

Defendants.

**18-CV-01561 RSL**

Civil Action No.

RELATOR RAJU A.T. DAHLSTROM'S ORIGINAL COMPLAINT FILED PURSUANT TO 31 U.S.C. §§ 3729 – 3732

*QUI TAM ACTION*

JURY TRIAL DEMANDED

## I. INTRODUCTION TO THIS FCA CASE

1.     Relator Raju A.T. Dahlstrom (hereinafter, "Relator" "Plaintiff" or "Dahlstrom"), by and through his undersigned attorney, submits this Original Complaint on behalf of the UNITED STATES OF AMERICA, and on his own behalf to recover all damages, penalties, and other remedies against Defendants: (a) Life Care Centers of America, Inc., ("Life Care") a for-profit Tennessee

QUI TAM COMPLAINT
UNDER SEAL

1

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rjr98007@gmail.com

Corporation; and (b) Sunrise Services, Inc., ("Sunrise") a for-profit, Washington Corporation, for violations of the False Claims Act (the "FCA"), 31 U.S.C. § 3729 et seq., and Relator also allege that Defendants not only violated the FCA, but also the federal whistleblower provisions against retaliation,[1] and Washington state laws, and would show the following:

## A. DEFENDANT LIFE CARE CENTERS OF AMERICA, INC

2.      Virtually on the eve of Relator's hire decision on October 24, 2016,[2] by Defendant Life Care Centers of America, Inc., (DBA: Life Care Center of Mount Vernon) the Department of Justice (DOJ), Office of Public Affairs releases the following headlines on this day:

**"LIFE CARE CENTERS OF AMERICA, INC. AGREES TO PAY $145 MILLION TO RESOLVE FALSE CLAIMS ACT ALLEGATIONS"[3]**

Life Care Centers of America Inc. (Life Care) and its owner, Forrest L. Preston, have agreed to pay $145 million to resolve a government lawsuit alleging that Life Care violated the False Claims Act by knowingly causing skilled nursing facilities (SNFs) to submit false claims to Medicare and TRICARE for rehabilitation therapy services that were not reasonable, necessary or skilled, the Department of Justice announced today. Life Care, based in Cleveland, Tennessee, owns and operates more than 220 skilled nursing facilities across the country.

"This resolution is the largest settlement with a skilled nursing facility chain in the department's history," said Principal Deputy Assistant Attorney General Benjamin C. Mizer, head of the Justice Department's Civil Division. "It is critically important that we

---

[1] The FCA's retaliation provision entitles an employee to relief if he is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against . . . *because of* lawful acts done . . . in furtherance of an action" under the FCA.  31 U.S.C. § 3730(h).

[2] On October 25, 2015, Relator commenced his work at Life Care Centers of America, Inc., (DBA: Life Care Center of Mount Vernon) as Director of Social Services, and was constructively discharged on August 31, 2018, after filing complaints of FCA, HIPPA, Title VII complaints for discrimination and retaliation.

[3] See, Department of Justice's Press Release regarding Life Care's FCA settlement agreement. Accessible online at: https://www.justice.gov/opa/pr/life-care-centers-america-inc-agrees-pay-145-million-resolve-false-claims-act-allegations.

QUI TAM COMPLAINT
UNDER SEAL                                          2                          LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

protect the integrity of government health care programs by ensuring that services are provided based on clinical rather than financial considerations."

This settlement resolves allegations that between Jan. 1, 2006 and Feb. 28, 2013, Life Care submitted false claims for rehabilitation therapy by engaging in a systematic effort to increase its Medicare and TRICARE billings. Medicare reimburses skilled nursing facilities at a daily rate that reflects the skilled therapy and nursing needs of their qualifying patients. The greater the skilled therapy and nursing needs of the patient, the higher the level of Medicare reimbursement. The highest level of Medicare reimbursement for skilled nursing facilities is for "Ultra High" patients who require a minimum of 720 minutes of skilled therapy from two therapy disciplines (e.g., physical, occupational, speech), one of which has to be provided five days a week.

The United States alleged in its complaint that Life Care instituted corporate-wide policies and practices designed to place as many beneficiaries in the Ultra High reimbursement level irrespective of the clinical needs of the patients, resulting in the provision of unreasonable and unnecessary therapy to many beneficiaries. Life Care also sought to keep patients longer than was necessary in order to continue billing for rehabilitation therapy, even after the treating therapists felt that therapy should be discontinued. Life Care carefully tracked the minutes of therapy provided to each patient and number of days in therapy to ensure that as many patients as possible were at the highest level of reimbursement for the longest possible period. The settlement also resolves allegations brought in a separate lawsuit by the United States that Forrest L. Preston, as the sole shareholder of Life Care, was unjustly enriched by Life Care's fraudulent scheme.

"Billing federal healthcare programs for medically unnecessary rehabilitation services not only undermines the viability of those programs, it exploits our most vulnerable citizens," said U.S. Attorney Nancy Stallard Harr for the Eastern District of Tennessee. "We are committed to working with our federal partners to protect both."

"The resolution announced today demonstrates the commitment of the U.S. Attorney's Office to aggressively pursue providers who utilize fraudulent practices to knowingly put their own financial self-interest over a duty to patients," said U.S. Attorney Wifredo A. Ferrer of the Southern District of Florida. "It is imperative that providers make healthcare decisions based upon a patient's need for services rather than a self-serving desire to maximize financial profit. Our office will continue to investigate fraud allegations, in order to ensure that providers do not compromise the integrity of our public health care programs."

QUI TAM COMPLAINT
UNDER SEAL

3

LAKE HILLS LEGAL SERVICES, P.C.
16600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

As part of this settlement, Life Care has also entered into a five-year chain-wide Corporate Integrity Agreement with the Department of Health and Human Services Office of Inspector General (HHS-OIG) that requires an independent review organization to annually assess the medical necessity and appropriateness of therapy services billed to Medicare.

"Therapy provided in skilled nursing facilities must be medically reasonable and necessary, and we will continue to vigorously investigate companies that subject their residents to needless and unreasonable therapy," said HHS Inspector General Daniel R. Levinson. "The corporate integrity agreement with Life Care is designed to ensure that it only provides therapy based on the individual needs of each resident."

The settlement, which was based on the company's ability to pay, resolves allegations originally brought in lawsuits filed under the qui tam, or whistleblower, provisions of the False Claims Act by Tammie Taylor and Glenda Martin, former Life Care employees. The act permits private parties to sue on behalf of the government for false claims for government funds and to receive a share of any recovery. The government may intervene and file its own complaint in such a lawsuit, as it has done in this case. The whistleblower reward in this case will be $29 million.

The settlement illustrates the government's emphasis on combating health care fraud and marks another achievement for the Health Care Fraud Prevention and Enforcement Action Team (HEAT) initiative, which was announced in May 2009 by the Attorney General and the Secretary of Health and Human Services. The partnership between the two departments has focused efforts to reduce and prevent Medicare and Medicaid financial fraud through enhanced cooperation. One of the most powerful tools in this effort is the False Claims Act. Since January 2009, the Justice Department has recovered a total of more than $31.6 billion through False Claims Act cases, with more than $19.2 billion of that amount recovered in cases involving fraud against federal health care programs.

This matter was handled by the Civil Division's Commercial Litigation Branch, the U.S. Attorneys' Offices for the Eastern District of Tennessee and the Southern District of Florida, and the HHS-OIG, with assistance from the U.S. Attorneys' Offices for the District of Colorado, the Middle District of Florida, the Northern District of Georgia, the District of Massachusetts and the District of South Carolina and NCI/Advance Med, a Medicare Zone Program Integrity Contractor.

The two qui tam cases are docketed as United States ex rel. Taylor v. Life Care Centers of America, Inc., No. 1:12-cv-64 (E.D. Tenn) and United States ex rel. Martin v. Life Care Centers of America,

QUI TAM COMPLAINT
UNDER SEAL                    4                    LAKE HILLS LEGAL SERVICES, P.C.
                                                  15600 N.E. 8th Street, # B1-358
                                                  Bellevue, Washington 98008
                                                  Telephone: (425) 829-5305
                                                  E-mail: rp98007@gmail.com

Inc., No. 1:08-cv-251 (E.D. Tenn). The case against Forrest L. Preston is captioned United States v. Preston, No. 1:16-cv-113 (E.D. Tenn). The claims resolved by the settlement are allegations only; there has been no determination of liability.

### B. DEFENDANT SUNRISE SERVICES, INC

"A Health Home is not a place. It is a set of services to support individuals who have serious chronic conditions and more than one medical or social service need. Health services can make things go more smoothly between medical and social service support. This may help reduce an individual's visits to hospitals and emergency room, support overall health, well-being, and self-care. Sunrise is a care coordination agency for Health Home services. Sunrise care coordinators meet with individuals and the agencies that support them to keep things moving forward. If individuals go in and out of the hospital, the care coordinator assist in planning transitions."[4]

3.      Defendant Sunrise provides "Health Homes" services under Medicare and Medicaid funding --that includes: (a) comprehensive care management; (b) care coordination and health promotion; (c) transition planning; (d) individual and family support; (e) referral to relevant community and social support services; and health education.

## II.      PARTIES

### A. Relator

4.      The Relator-Plaintiff is (registered counselor)[5] and a former Director

---

[4] See, Health Homes description by Sunrise accessible online at: http://sunriseservices.com/health-homes/.

[5] Relator's **CURRENT CREDENTIAL:**

| Type | Counselor Agency (Affiliated) |
|---|---|
| Registration (CAFR) | Credential Number: CG6015436 |
| Issuing Agency | Department of Health – Washington |
| Status | Active |
| Effective Date | 06/28/2010 |

QUI TAM COMPLAINT
UNBER SEAL                                        5                LAKE HILLS LEGAL SERVICES, P.C.
16600 N.E. 8ᵗʰ Street, # B3-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp78007@gmail.com

of Social Services at Life Care Centers of America, Inc., d/b/a: Life Care Center of Mount Vernon (LCCMV), Mount Vernon, Skagit County, Washington, from October 25, 2016, until he was constructively discharged by submitting his resignation effective August 31, 2018,[6] because of the discriminatory and retaliatory[7] conduct by Life Care Centers of America, Inc.

5. The LCCMV is owned and operated by defendant Life Care. Relator commenced (his qui tam complaining and concerns with Defendants: Life Care and Sunrise during a brief window of his employment with Life Care and was compelled to address false-allegations initiated by governmental and private agency operatives with one objective in mind. To destroy Relator because of his active participation in protected activities.

6. Specifically, Relator was subjected to addressing false-complaints (ostensibly) filed against him involving two vulnerable adults identified as **Patient A and B** respectively who were patients at Life Care Centers of America, Inc., from on or about October 2017 and July 2018 respectively. Both **Patients A and B**[8] were utilized as retaliatory (battering ram) against Relator by State of Washington, Department of Social and Health Services (DSHS), and its constituent agencies: Adult Protective Services and Division of Developmental Disabilities and Sunrise Services, Inc., and by extension, Life Care Centers of America, Inc., because of Relator's ongoing protected activities exposing FCA, HIPPA, and other health and safety violations at the Life Care and Sunrise's ongoing fraudulent

---

[6] On or about September 2018, Relator filed an (EEOC Charge No. 551-2018-03535) and shortly thereafter received a right-to-sue letter from the EEOC.

[7] Some of Relators complaints against Life Care focused on Title VII of the Civil Rights Act of 1964, as amended, was filed with the U.S. Equal Employment Commission and crossed-filed with the Washington State Human Rights Commission (WSHRC), under the Washington Law Against Discrimination.

[8] Patient A and B are pseudonyms and is being referred as such to protect HIPPA-privacy.

QUI TAM COMPLAINT
UNDER SEAL                                    6                    LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # 31-355
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp99007@gmail.com

participation in the Health Home programs –specifically, relating to patients at the LCCMV who were receiving services (contractually, through Sunrise or Northwest Regional Council –who contracted with Sunrise and being paid through Medicare and Medicaid through the Health Homes Programs).

**B. Defendant Life Care Centers of America, Inc.**

7.      Defendant Life Care Centers of America, Inc., is headquartered in Cleveland, Tennessee. Life Care is a for profit corporation that manages and/or owns over 200 skilled nursing facilities across the country, including over 20 facilities in Tennessee. Medicare paid Life Care and its facilities over $4.2 billion from January 2006 through December 2011 for inpatient services at its nursing facilities.

8.      Defendant Life Care Centers of America, Inc., is a corporation organized and existing under the laws of the State of Tennessee with its headquarters in Cleveland, Tennessee while conducting business in the State of Washington.  According to its Corporate Disclosure Statement, Defendant Life Care Centers of America, Inc., has no parent corporation and is not owned by any publicly held corporation.

9.      Forrest L. Preston is listed as Registered Agent of Life Care Centers of America, Inc., a For-profit Corporation, established on 01/06/1976) according to <u>2017 Annual Report</u> filed on 03/06/2018, with the Division of Business Services, Department of State ("SOS") (SOS Control Number: 000018476), State of Tennessee. Life Care' corporate information accessible online at: <u>https://tnbear.tn.gov/Ecommerce/FilingDetail.aspx?CN=00914723223804706902</u> <u>11661751671820531071900771 84</u>.

**C. Defendant Sunrise Services, Inc.**

QUI TAM COMPLAINT
UNDER SEAL

7

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

10.     Defendant Sunrise Services, Inc., is headquartered in Everett, Washington. Sunrise is a for profit corporation that manages social and health services and implements the Health Home Programs under (contracts or subcontracts) through the Northwest Regional Council (NWRC),[9] and receiving Medicare and Medicaid funding to implement its Health Homes programs.

11.     Ms. Sue Ann Closser, President, Owner, Governor/Agent of Sunrise Services, Inc., located: Post Office Box 2569 811 Madison Everett, Washington 98213. Telephone: (425) 347-3149 | Facsimile: (425) 347-0492. Sunrise's corporate information is accessible online at: https://www.sos.wa.gov/corps/business.aspx?ubi=600231010.

## III.     RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

12.     Any and all acts alleged herein to have been committed by Defendants Life Care and Sunrise (as a prospective employer) were committed by officers, directors, employees, representatives, or agents of those respective defendants, who at all times acted on behalf of the named defendants and within the course and scope of their employment.

## IV.     ADMINISTRATIVE PREREQUISITES

13.     Qui Tam Standing: Plaintiff/Relator Dahlstrom is a "person" and has standing to bring this qui tam on behalf of the United States of America and himself. See, Vermont Agency of Natural Resources v. United states ex rel. Stevens. 529 U.S. 765, 778, 120 S. Ct. 1858. 1865 (2000) ("a qui tam relator under FCA has Article II standing.").

---

[9] As an association of county governments, the Northwest Regional Council (NWRC) has been serving people of Island, san Juan, Skagit, and Whatcom Counties since 1971, is governed by a board of directors that is composed of two elected officials from each member county. The NWRC Governing Board, effective January 12, 2016. See, https://www.nwrcwa.org/nwrc-governing-board/.

QUI TAM COMPLAINT
UNDER SEAL                                        8                    LAKE HILLS LEGAL SERVICES, P.C.
                                                                      15600 N.E. 8ᵗʰ Street, # B1-359
                                                                      Bellevue, Washington 98008
                                                                      Telephone: (425) 829-5305
                                                                      E-mail: ry98007@gmail.com

14.   Original Source: Plaintiff/Relator Dahlstrom is an "original source" of (some) or all of the information on which the allegations contained hereto are based, as the term is defined in 31 U.S.C. §3730(c)(4).

15.   Disclosure Statement: Plaintiff/Relator Dahlstrom will simultaneously, with the filing this Complaint provide "Disclosure of Substantially All Material Evidence and Information" pursuant to 31 U.S.C. U.S.C. §3730(b)(2) to the United States Attorney Annette L. Hayes[10], United States Attorney's Office for the Western District of Washington.

16.   Intervention by the United States Government: Should the United States Government elects to intervene in this action, pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(4)(A), the Plaintiff/Relator Dahlstrom will provide every assistance in the execution of this Complaint.

17.   Declination by the United States Government: In the alternative, should the United states Government decline to intervene in this action, pursuant to the False Claims, 31 U.S.C. § 3730(b)(4)(B), Plaintiff/Relator Dahlstrom is willing to continue the prosecution of this Complaint on behalf of the United States Government. Plaintiff/Relator will comply with the provisions as provided by 31 U.S.C. § 3730(c)(3).

## V.   JURISDICTION AND VENUE

18.   This Court has jurisdiction under 31 U.S.C. § 3730, and 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain the common law causes of action under 28 U.S.C. § 1367(a). The Court may exercise personal jurisdiction over the defendant because the defendant resides and/or transacts business in the

---

[10] United States Attorney's Office 700 Stewart Street, Suite 5220 Seattle, WA 98101-1271
Telephone: (206) 553-7970 Toll Free: (800) 797-6722 Fax Line: (206) 553-0882.

QUI TAM COMPLAINT
UNDER SEAL                                    9                    LAKE HILLS LEGAL SERVICES, P.C.
                                                                   15600 N.E. 8th Street, # B1-358
                                                                   Bellevue, Washington 98008
                                                                   Telephone: (425) 829-5305
                                                                   E-mail: rp90007@gmail.com

1  Western District of Washington or committed proscribed acts in this District.

2      19.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28

3  U.S.C. § 1391(b) and (c), as the place where the defendant resides and where a

4  substantial part of the events or omissions giving rise to the claims occurred.

## VI.      STATUTORY BACKGROUND

### A. FALSE CLAIMS ACT[11]

7      20.      Congress enacted the FCA in 1863 as a tool for "prevent[ing] and

8  punish[ing] frauds upon the government of the United States."[12] Concern with

9  "frauds and corruptions practiced in obtaining pay from the government during the

10 [Civil War]" motivated a forceful legislative response.[13] The Act created liability

11 for a number of actions negatively affecting the government fisc,[14] set the damages

12 and penalties that the government can recover,[15] and permitted private citizens to

13 bring suit on behalf of the government.[16] FCA suits brought by private citizen

14 plaintiffs are known as qui tam actions.[17] In 1986, Congress amended the FCA in

15 order to better facilitate qui tam actions,[18] increase recoveries by raising the

16 damages multiplier and civil penalties,[19]define the scienter requirement,[20] and

---

[11] Paragraphs 19-20 of this Qui Tam Complaint is directly quoted from: Peter T. Thomas, *Trial by Formula: The Use of Statistical Sampling and Extrapolation in Establishing Liability Under the False Claims Act*, 74 Wash. & Lee L. Rev. Online 215 (2017), https://scholarlycommons.law.wlu.edu/wlulr-online/vol74/iss1/11., and through access online at:
https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1089&context=wlulr-online.

[12] Act of Mar. 2, 1863, ch. 67, 12 Stat. 696.

[13] CONG. GLOBE, 37th Cong., 3d Sess. 952 (1863).

[14] See Act of Mar. 2, 1863, ch. 67, § 1, 12 Stat. 696, (defining violations of the Act)

[15] See id. § 3 (establishing double damages, civil penalties, and costs to be assessed against private citizens found in violation of the statute and for court marshals in cases involving military personnel).

[16] See id. § 4 (allowing a private person to bring suit under the Act on behalf of the government).

[17] See Vt. Agency of Nat. Resources v. United States ex rel. Stevens, 529 U.S. 765, 768–69 (2000) (examining the ability of relators to bring qui tam actions on behalf of the government).

[18] See S. REP. NO. 99-345, at 2 (1986) ("The proposed legislation seeks . . . to provide the Government's law enforcers with more effective tools . . . ."). 32. See id. at 17 (increasing the damages multiplier and penalties).

[19] See id. at 17 (increasing the damages multiplier and penalties).

[20] See id. at 20 (clarifying the definition of knowledge under the FCA).

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone (425) 829-5305
E-mail: ry98007@gmail.com

clearly establish preponderance of the evidence as the burden of proof for each FCA element.[21] The Fraud Enforcement and Recovery Act of 2009 (FERA)[22] again amended the FCA[23] to remove a judicially created requirement that false claims be presented to a government employee.[24] This amendment also created a statutory definition for the materiality element.[25] There have also been two more recent amendments that are not relevant to statistical sampling.[26]

21.     The FCA provides, in pertinent part, that any person who: (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim...is liable to the United States Government [for statutory damages and such penalties as are allowed by law]. 31 U.S.C. § 3729(a)(1)-(2) (2006), as amended by 31 U.S.C. § 3729(a)(1)(A)-(B).

22.     The FCA further provides that "knowing" and "knowingly" (A) mean that a person, with respect to information- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the

---

[21] See id. at 30–31 (stating the burden of proof under the FCA).

[22] Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621 (2009) (amending the FCA).

[23] See id. (amending the FCA); see also S. REP. NO. 111-10, at 10–11 (2009) (altering language in the FCA relied upon by the Supreme Court in Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662 (2008), when determining that the FCA required an intent "to get" the government to pay the amount falsely claimed).

[24] See Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662, 668–69 (2008) (basing an additional intent requirement that a defendant have the "purpose of getting a false . . . claim paid or approved by the Government" on the language "to get")

[25] See S. REP. NO. 111-10 at 12 (2009) ("[T]he new term 'material' is defined later in this section to mean 'having a natural tendency to influence, or being capable of influencing, the payment or receipt of money or property.'").

[26] See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901 (2010) (modifying the public disclosure bar); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1079A(c), 124 Stat. 1376, 2079–80 (2010) (amending the FCA's retaliation language).

QUI TAM COMPLAINT
UNDER SEAL                                                                11

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

information; and (B) require no proof of specific intent to defraud[.] 31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b)(1) (West 2010). The FCA, at 31 U.S.C. § 3729(a)(1), provides that a person is liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation.

## B. MEDICARE PROGRAMS IN SKILLED NURSING FACILITIES

23.     Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. See 42 U.S.C. §§ 426, 426A.

24.     The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

25.     Subject to certain conditions, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (i.e., spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. §409.61(b), (c).

26.     The conditions that Medicare imposes on its Part A skilled nursing facility ("SNF") benefit include: (1) that the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) that the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. §

QUI TAM COMPLAINT
UNDER SEAL

12

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp78007@gmail.com

1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

27.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the nursing facility and to re-certify to the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. See 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

28.     To be considered a skilled service, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. See 42 C.F.R. § 409.31(a).

29.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitious exercises (e.g., exercises to improve gait, maintain strength or endurance, or assistive walking). See 42 C.F.R. § 409.33(d). "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature. Those services can be performed by supportive personnel; e.g., aides or nursing personnel . . . ." Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

30.     Medicare Part A will only cover those services that are reasonable and necessary. See 42 U.S.C. § 1395y(a)(1)(A); see also 42 U.S.C. § 1320c-5(a)(1) (providers must assure that they provide services economically and only when, and to the extent, medically necessary) ; 42 U.S.C. § 1320c-5(a)(2) (services provided must be of a quality which meets professionally recognized standards of health

QUI TAM COMPLAINT
UNDER SEAL

13

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry08807@gmail.com

care).

31.     In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity. See Medicare Benefit Policy Manual, Ch. 8, § 30.

32.     In order to assess the reasonableness and necessity of those services and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that: No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period. 42 U.S.C. § 1395l(e).

## C. WASHINGTON FINANCIAL ALIGNMENT DEMONSTRATION UNDER MEDICARE AND BIRTH OF HEALTH HOMES

33.     On October 25, 2012,[27] the U.S. Department of Health and Human

---

[27] See additional supporting documents regarding CMS and the State of Washington engagement from October 2012 through the present, as annexed below:
(a) https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/WAMFFSFDA.pdf.
(b) https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/WAMFFSFDA_Amendment.pdf.
(c) https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/WAMFFSMOU.pdf.
(d) https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/WashingtonProposal.pdf.

QUI TAM COMPLAINT
UNDER SEAL                                                     14                          LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

Services announced that the state of Washington would become the first state to partner with the Centers for Medicare & Medicaid Services (CMS) in the Financial Alignment Initiative to test a Managed Fee for Service (MFFS) model for providing Medicare-Medicaid enrollees with a more coordinated, person-centered care experience. Through the demonstration, Washington is building upon its Medicaid health home model, targeting Medicare-Medicaid enrollees with chronic health conditions. The demonstration began on July 1, 2013.

34.   Individuals receiving Health Home services are assigned a Health Home care coordinator who will partner with eligible individuals, their families, doctors, mental health providers, chemical dependency services, long-term services and supports and other agencies to ensure coordination across these systems of care. In addition, the health home coordinator will make in-person visits and be available by telephone to help the individual, their families, and service providers to: (a) Conduct screenings to identify health risks and referral needs; (b) Set goals that will improve beneficiaries' health and service access; (c) Improve management of health conditions through education and coaching; (d) Make changes to improve beneficiaries' ability to function in their home and community and their self-care abilities; (e) Access the right care, at the right time and place;

---

(e)  https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/WAFirstAnnualEvalReport.pdf.
(f)  https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/WAFirstAnnualEvalReportAppendices.pdf.
(g)  https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/WAEvalMedicareCostYr1FinalYr2Preliminary072817.pdf., and
(h)  https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/WAEvalPlan.pdf.

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B8-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ryf90007@gmail.com

(f) Successfully transition from hospital to other settings and get necessary follow-up care; and (g) Reduce avoidable health care costs.

35.   Additionally, the referrals for individuals who meet the risk modeling criteria (PRISM) are generated by the Health Care Authority (HCA) and sent to local Care Coordination Organizations (CCOs). The CCOs then reach out to the individuals to offer Health Home services.

### D. STATEMENT OF INITIATIVE[28]

36.   CMS and the State agree to begin this Managed Fee-for-Service Financial Alignment Demonstration on July 1, 2013, and continue until December 31, 2018, unless extended or terminated pursuant to the terms and conditions in Section V or VI, respectively, of this Agreement.

37.   To establish a Federal-State partnership between the Centers for Medicare & Medicaid Services (CMS) and the State of Washington (the Washington State Health Authority/Washington State Department of Social & Health Services) to implement HealthPath Washington: A Medicare and Medicaid Integration Project, Managed Fee-for-Service Model (Demonstration) to better serve individuals eligible for both Medicare and Medicaid ("Medicare-Medicaid enrollees" or "beneficiaries"). The Federal-State partnership will provide the State with a new opportunity to establish a care management program for Medicare-Medicaid enrollees meeting high-cost/high-risk criteria that will coordinate

---

[28] **Demonstration Authority:** Under the authority at section 1115A of the Social Security Act ("Act"), the Center for Medicare and Medicaid Innovation is authorized to "…test payment and service delivery models …to determine the effect of applying such models under [Medicare and Medicaid]." Such models include but are not limited to the models described in section 1115A(b)(2)(B) of the Act. Section 1115A(d)(1) authorizes the Secretary to waive such requirements of titles XI and XVIII of the Act and of Sections 1902(a)(1), 1902(a)(13), and 1903(m)(2)(A)(iii) of the Act as may be necessary solely for purposes of testing models described in section 1115A(b). *See also,* https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/FinancialAlignmentInitiative/Downloads/WAMFFSMOU.pdf.

QUI TAM COMPLAINT
UNDER SEAL                                      16                        LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry58607@gmail.com

services across Medicare and Medicaid and allow the State and the Federal government to benefit from savings resulting from improvements in quality and reductions in costs. CMS plans to begin this Managed Fee-for-Service Financial Alignment Demonstration on April 1, 2013, and continue until December 31, 2016, unless terminated or extended pursuant to the terms and conditions of the Final Demonstration Agreement. The initiative is intended to alleviate fragmentation and improve coordination of services for high-cost, high-risk Medicare-Medicaid enrollees served primarily in fee-for-service systems of care. Improved coordination is intended to improve beneficiary outcomes and reduce overall costs over time for the State and the Federal government. (See Appendix 1 for definitions of terms and acronyms used in this MOU.)

38.     Under this Demonstration, beneficiaries decide whether to receive health home services. With the exception of the addition of Medicaid health home services, this Demonstration does not change Medicare or Medicaid benefits in any way, nor does it affect an individual's choice of Medicare and Medicaid providers. Health home services will not be provided unless and until a beneficiary elects to receive them. The process by which beneficiaries will be identified as eligible for and elect to receive health home services is as follows (See III.B and Appendix 7 for additional information):

**Beneficiary Eligibility: On a monthly basis, the State will identify which beneficiaries meet the eligibility criteria to receive health home services (See III.B for additional detail).**

**Enrollment: Effective the first of the following month, the State will enroll those beneficiaries (excepting certain populations as specified in III.B.1) with a qualified Health Home Network. This step requires no action by beneficiaries and does not change their**

QUI TAM COMPLAINT
UNDER SEAL

17

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone (425) 829-5305
E-mail: rp98007@gmail.com

eligibility for other services or choice of Medicare or Medicaid providers in any way.

**Assignment:** Following enrollment, the Health Home Lead Entity will assign enrolled beneficiaries to one of their subcontracted Health Home Care Coordination Organizations.

**Outreach and Engagement:** The Health Home Care Coordination Organization will perform outreach and engagement activities to those beneficiaries it has been assigned.

**Health Action Plan and Health Home Services:** Following outreach and engagement, a beneficiary will have the opportunity to elect whether to receive health home services, through completion of a Health Action Plan (a beneficiary-prioritized plan identifying what the beneficiary plans to do to improve his/her health). If a beneficiary elects to receive health home services, delivery of health home services to the beneficiary will begin, as will provider reimbursement for these services. (See Appendix 1 for definitions of terminology used above.)

39.     Since October 12, 2012[29] through the present, CMS, the State of Washington, Sunrise and NWRC and other organizations have actively participated in the Health Homes programs –insisting that it has saved the United States Government millions of dollars in (SAVINGS) –thus reducing unreasonable or extended stays in hospitals and SNF. However Sunrise's claims are deceiving.

## VII.   RELATOR'S DISCOVERY OF DEFENDANTS' FRAUDULENT OR RETALIATORY CONDUCT

40.     Namely, in or around May 2018 through mid-August 2018, Relator actively questioned and reported his concerns to Sunrise, NWRC (Mr. Peter

---

[29] *Id.*

QUI TAM COMPLAINT
UNDER SEAL

18

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp99007@gmail.com

Acosta) and Life Care about the fraudulent claims and basis for continuation of Health Home-type services being provided to patients who have either no likelihood for returning to their original Health Homes or transitioning to lower cost living situation.

41.     Specifically, Patient B was identified by Relator as just a "tip-of-the iceberg" for his contention that Patient B at the outset upon admission to the Life Care was subject to Health Home scams and that Medicare and Medicaid paid hundreds of thousands of dollars to maintain the "illusion" that the Patient B was otherwise and continuing to be eligible to remain in her (forever) Health Home arrangement despite sever comorbid conditions, for which the Health Home did not wish to perpetuate, however, Sunrise attempted to never sunset on their Health Home patients, thus, continuing to collect Medicare and Medicaid dollars as illustrated by their conduct with regards to Patient B.

42.     Further, Sunrise advocated for extensive and expensive interventions on behalf of Patient B —which clearly was incompatible with the lawful programs implemented to eliminate such waste, fraud, and abuse of limited Medicare and Medicaid resources.

43.     The Relator informed officials at Sunrise and Life Care that the admission diagnosis was virtually the same diagnosis for which Patient B was paraded around through multiple hospitalizations in and out of her Health Home, hospital(s), skilled nursing facilities, and the like, until Patient B was compromised.

44.     For example: Mr. Peter Acosta a representative-employee of Northwest Regional Council who directly interacted with Relator on a frequent basis, between the months of January to July 2018, at Life Care. During one of

QUI TAM COMPLAINT
UNDER SEAL                                    19                    LAKE HILLS LEGAL SERVICES, P.C.
                                                                        15600 N.E. 8ᵗʰ Street, # B1-350
                                                                        Bellevue, Washington 98008
                                                                        Telephone: (425) 829-5305
                                                                        E-mail: rp98007@gmail.com

these contacts, Mr. Acosta reiterated to Relator that he was involved in the Health Home Program and had the friendly ears of the *State of Washington* —both the Office of the Attorney General and the Legal Services Department at the Department of Health. Relator informed Mr. Acosta on several occasions while he visited the Life Care –that he (Relator) was concerned about the over-exaggeration of Sunrise's role in the Health Home programs –ostensibly feeding of the Medicare and Medicaid –without any real expectations that patients (some of them with sever dementia was ever going to walk out of Life Care alive); but Sunrise and NWRC by extension was providing duplicative or worthless services –in contravention to FCA.

45.    However, despite the fact that Sunrise's efforts to the contrary attempted to place false-light on their miserable failure to honestly address the fraud they were perpetrating against the Government in the form of receiving payments for providing "sham" Health Home type-care, but also refused to acknowledge that their schemes additionally and eventually compromised an already vulnerable (Patient B) at the outset. Specifically, Patient B suffered serious medical conditions prior to ever being admitted to Life Care, but Sunrise was motivated more by avarice and greed to continue to create the appearance that their HEALTH HOME was actually achieving its objective to reduce or minimize cost to the government by otherwise reducing hospital and skilled nursing home stays.

46.    Plainly, Patient B was eligible for long-term skilled nursing care upon discharge from repeated hospitalizations because of comorbid conditions for which a return home with COPES services were inadequate prior to and continuing until Patient B's death in July 2018.

47.    Immediately, upon the death of Patient B, Sunrise seeking "whistle-

QUI TAM COMPLAINT
UNDER SEAL

20

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

blower" protections filed false-charges against Relator with the State of Washington, Department of Health (DOH), with assistance from the State of Washington, Department of Social and Health Services (DSHS) employee, Tia Y. Mathews, Case Resource Manager, Division of Developmental Disabilities – dressing their complaint as "negligence of patient" by Relator while Patient B was at Life Care and then subsequently with the death of Patient B.

48.     Specifically, Sunrise sought to distance themselves from the death of Patient B, by falsely scapegoating Relator as the negligent party to evade detection for their ongoing FCA violations, perpetrated upon the Federal Government.

49.     What Sunrise and DSHS failed to neglect (and in haste) to report to the DOH accurately in its (whistle-blower) complaint filed against Relator that Patient B's cause of death (as stated in the death certificate) was attributed to: (A) Septic shock, and (B) Aspiration Pneumonia. Other conditions contributing to the Death: is listed as: Staphylococcal Bacteremia (2 days); and Acute Respiratory Failure (2 days). Clearly, Relator as Director of Social Services at Life Care was incapable of curing –because he lacked medical credentials to prevent the alleged neglectful death of Patient B.

50.     Note that Patient B's Certificate of Death do not list Relator has having contributed to the death of Patient. Clearly, the conduct of both Sunrise and DSHS is not protected under Right of Free speech accorded 1st Amendment protections[30] nor does it provide safe-harbor under the "whistle-blower"[31] protections from defamation under Washington law.

51.     Further, Relator brings this FCA action against Defendant Sunrise

---

[30] See also analysis of the intersection between Anti-SLAPP Statute, defamatory conduct, and Free Speech under the 1st Amendment, In re: Clifford v. Trump, --- F.Supp.3d ---(2018). Note: Appeal filed by STEPHANIE CLIFFORD v. DONALD TRUMP, 9th Cir., October 16, 2018. 2018 WL. 4997419.

[31] See, Washington Administrative Code (WAC) WAC 246-15-010(9).

QUI TAM COMPLAINT
UNDER SEAL                                      21                         LAKE HILLS LEGAL SERVICES, P.C.
                                                                           15600 N.E. 8th Street, # B1-358
                                                                           Bellevue, Washington 98008
                                                                           Telephone (425) 829-5305
                                                                           E-mail: rp8807@gmail.com

Services, Inc., to recover millions of dollars that flows through their active participation in the Health Homes Care Programs, causing Medicare programs to pay for services  that were not covered or duplicative, not reasonable and necessary, and may actually be resulting in the increasing or worsening of medical conditions of patients that are actually properly served through hospitalizations and subsequent placements into long-term skilled nursing care facilities. Instead Defendant Sunrise knowingly allow patients to deteriorate in their Health Home Program due to contractual obligations mandating that these severely compromised patients remain in their own home –despite experiencing numerous visits in and out of hospitals or SNF. Relator's concerns regarding the FCA violations (*i.e.,* patients served by Sunrise's Health Home Programs and others) to his immediate supervisor at Life Care Centers of America, Inc., which was met immediately with retaliatory animus toward him.

52.    In addition, Relator was subjected to retaliation for having brought his complaint to Sunrise Services' employees regarding alleged violations of the FCA, by being falsely charged with the "negligent death" of a patient at Life Care Centers of America, Inc.

53.    Sunrise is also made defendant for *qui tam* violations through their involvement in the Health Home Programs, , to make overpayments[32] of Medicare, Medicaid, and other benefits.

54.    Relator Dahlstrom also brings parallel claims under state law on alleges that he was unlawfully denied employment in retaliation for his whistleblowing actions against both Life Care and Sunrise while employed at the

---

[32] *See United States v. Life Care Centers of Am., Inc.,* 114 F. Supp. 3d 549, 560 (E.D. Tenn. 2014) (listing previous cases where a party attempted to use statistical sampling and extrapolation in establishing liability under the False Claims Act).

QUI TAM COMPLAINT
UNDER SEAL

22

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

latter.

55. Upon information and belief, Relator's complaint does not violate the FCA's 'first-to-file bar,' which prohibits a person from belonging a "related action when an FCA suit is "pending." 31 U.S.C. § 3730(b)(5).

56. Additionally, On or about August 1, 2018, Relator Raju A.T. Dahlstrom, while employed by **Life Care Centers of America, Incorporated**, as Director of Social Services, notified his immediate supervisor, Jennifer Kay Scott, Executive Director that he was contemporaneously engaged in vindicating and/or exercising his rights pursuant to:

(a) Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. § 2000e *et seq.*, ("Title VII");

(b) Washington Law Against Discrimination ("WLAD"), Wash. Rev. Code §§ 49.60.010– 49.60.505; and

(c) False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.

57. ***Specifically,*** Relator directly observed Defendant SUNRISE SERVICES, INCORPORATED, A Washington For-Profit Corporation, justify their Health Home programs by unnecessarily prolonging its involvement in Patient B's care, and justifying their conduct and collecting Medicare and Medicaid monies –while along violating the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, by submitting directly or indirectly (via NWRC) to the United States false or fraudulent claims for payment.

## ADDITIONAL STATUTORY BACKGROUND

58. The FCA imposes significant penalties on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the Government or any person who "knowingly makes,

QUI TAM COMPLAINT
UNDER SEAL                                23                LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry98007@gmail.com

1   uses, or causes to be made or used, a false record or statement material to a false

2   or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B).

3      59.    Rather than rely solely on federal enforcement of these provisions,

4   Congress decided to deputize private individuals, encouraging them to come

5   forward with claims on behalf of the Government in the form of *qui tam* suits. *Qui*

6   *tam* provisions are not new to federal law, appearing as early as the first Congress.

7   J. Randy Beck, *The False Claims Act and the English Eradication of Qui Tam*

8   *Legislation*, 78 N.C. L. REV. 539, 554 n.54 (2000). In fact, the FCA and its *qui*

9   *tam* provisions emerged "midway through the Civil War, in response to frauds

10   perpetrated in connection with Union military procurement." *Id.* at 555.

11

12      60.    Under the FCA's *qui tam* provisions, "a private party, called the

13   relator, challenges fraudulent claims against the [G]overnment on the

14   [G]overnment's behalf, ultimately sharing in any recovery." *See* 31 U.S.C. §

15   3730(b). The relator may be awarded up to thirty percent of the proceeds ultimately

16   recovered. 31 U.S.C. § 3730(d). Relators need not allege personal injury but

17   instead sue "to remedy an injury in fact suffered by the United States." *Vt. Agency*

18   *of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).

19      61.    The Government may intervene in any *qui tam* action, taking over

20   from the relator, and, in that event, limiting the relator's share of the recovery to at

21   most twenty-five percent. 31 U.S.C. § 3730(b)(2), (d)(1). The FCA provides that a

22   "copy of the complaint . . . shall be served on the Government." *Id.* § 3730(b)(2).

23   "The complaint shall be filed in camera, shall remain under seal for at least 60 days,

24   and shall not be served on the defendant until the court so orders. The Government

25   may elect to intervene and proceed with the action within 60 days after it receives

26   both the complaint and the material evidence and information." *Id.* Moreover, the

27

QUI TAM COMPLAINT
UNDER SEAL

24

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp58087@gmail.com

"Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal." *Id.* § 3730(b)(3). "Before the expiration of the 60-day period or any extensions," however, the Government shall "(A) proceed with the action, in which case the action shall be conducted by the Government; or (B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." *Id.* § 3730(b)(4).

62.    Sunrise is a social services and mental health agency. Relator, a former Life Care Centers of America, Inc., employee, alleges that in the course of his employment he became aware that, from at least May 2018 (and continuing).

63.    As a *qui tam* statute, the FCA permits private persons, known as "relators," to bring actions to recover damages on behalf of the United States. 31 U.S.C. § 3730(b). The statute includes other procedural requirements. *First*, the statute provides that a relator must file his or her complaint under seal so as to permit the government to decide whether it wants to intervene. *See id.* § 3730(b)(2). At the Government's request, the seal can remain in effect indefinitely; moreover, even if the Government declines to intervene at the outset, it may do so at any point later in the litigation upon a showing of good cause. *See id.* § 3730(b)(3). *Second*, certain provisions of the statute provide incentives for relators to file quickly, while balancing the Government's interest in notice with concerns about parasitic or opportunistic law suits. The "first-to-file" bar, for instance, states that once an action has been brought, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." *Id.* § 3730(b)(5). Relatedly, the "public disclosure" bar generally requires courts to "dismiss an action" if "substantially the same allegations or transactions

QUI TAM COMPLAINT
UNDER SEAL                                            25                            LAKE HILLS LEGAL SERVICES, P.C.
                                                                                          15600 N.E. 8th Street, # B1-358
                                                                                          Bellevue, Washington 98008
                                                                                          Telephone: (425) 829-5305
                                                                                          E-mail: rp98007@gmail.com

as alleged in the action or claim were publicly disclosed" at an earlier date. *Id.* § 3730(e)(4)(A). In this particular filing, Relator believes that he is uniquely in the position to observe the illegal conduct of Sunrise –in their attempts to bulk tax payers by falsely claiming that Patient B was just going to walk out of life care and return to the Health Homes program. Sunrise actions were deliberately calibrated to deceive the Government.

64.    The False Claims Act imposes civil liability on individuals who knowingly defraud the United States of America. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016). The Act may be enforced either by the government or, under its *qui tam* provision, by a private person acting as a "relator" on the government's behalf. 31 U.S.C. § 3730(b)(1); *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 440 (2016). When a private party brings a qui tam suit, the complaint is sealed (and thus unknown to the defendant) but served on the government with a summary of all material evidence. 31 U.S.C. § 3730(b)(2); *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1973 (2015).

65.    Upon learning of a qui tam action, the government has multiple options for action. One of those options is taking over the lawsuit, and, if the government does take control, the relator will receive 15% to 25% of any recovery. 31 U.S.C. § 3730(d)(1). The government also can decline to participate directly, and, if it chooses that option, the relator can continue prosecuting the case on the government's behalf. *See* 31 U.S.C. § 3730(b)(4)(B), (c)(3); *Kellogg Brown & Root Servs., Inc.*, 135 S. Ct. at 1973; *Stoner v. Santa Clara Cty. Office of Educ.*, 502 F.3d 1116, 1126–27 (9th Cir. 2007).

66.    A relator who successfully prosecutes a qui tam action without

QUI TAM COMPLAINT
UNDER SEAL                                         26                    LAKE HILLS LEGAL SERVICES, P.C.
                                                                        15600 N.E. 8th Street, # B1-358
                                                                        Bellevue, Washington 98008
                                                                        Telephone: (425) 829-5305
                                                                        E-mail: rp09007@gmail.com

government involvement will receive 25% to 30% of the recovery. 31 U.S.C. § 3730(d)(2). A third option available to the government is seeking recovery for fraud through an "alternate remedy," including "any administrative proceeding to determine a civil money penalty." 31 U.S.C. § 3730(c)(5). When the government pursues an "alternate remedy," the relator has the same rights in that proceeding as if the qui tam action had continued, including the right to recover a percentage of any recovery. 31 U.S.C. § 3730(c)(5); *United States v. Sprint Commc'ns, Inc.*, 855 F.3d 985, 990 (9th Cir. 2017); *United States ex rel. Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 373 (8th Cir. 2015).

67.     Washington is one of 15 states that received an 18-month planning grant from the Centers for Medicare and Medicaid Services (CMS) to develop a multi-phased design and implementation plan for innovative service delivery models that integrate care for individuals receiving services from both Medicare and Medicaid. The grant goals are to improve the care experience and health outcomes of individuals served under these programs and decrease overall costs. This grant provides an opportunity for the State and CMS to design integrated care and a shared savings plan that would align incentives to ensure the right care, for the right person, at the right time.

68.     Governance of the grant is shared between The Washington Department of Social and Health Services, Aging and Disability Services Administration (DSHS/ADSA) and The Health Care Authority (HCA). Together with stakeholders, the two agencies have collaborated extensively over the grant period to develop new strategies to improve health care, services and supports and their associated costs. The HCA is the Medicaid agency responsible for purchasing Medicaid medical services. ADSA is responsible for purchasing, program and

QUI TAM COMPLAINT
UNDER SEAL

27

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

service development for mental health, chemical dependency, long term services and supports and services to individuals with developmental disabilities. The project has been informed by a broad range of stakeholders who have participated in a wide variety of engagement activities throughout the past ten months.

69.    The state uses a standardized assessment for beneficiaries receiving long term services and supports and services for individuals with developmental disabilities that embeds evidence-based screening and risk-based protocols to support care coordination across service domains. These include: PHQ-9 depression screen, CAGE alcohol and drug screen, diagnosis, medications and medical treatments, and use of the minimum data set to determine need for activity of daily living assistance or changes in health status. In addition, nursing protocols are triggered to ensure in person or telephone consultation with an RN. Nursing protocols in the assessment are triggered based upon: complicated medication regimens; unstable or changing diagnosis; untreated pain management issues; nutritional status or weight issues; and risk of skin breakdown, while patients or clients are served inside their Health Homes.

## ADDITIONAL RETALIATORY CONDUCT
## BY DEFENDANT LIFE CARE CENTERS OF AMERICA, INC.,
## AGAINST RELATOR RAJU A.T. DAHLSTROM

70.    Plaintiff Raju A.T. Dahlstrom worked as a Social Services Director for Defendant Life Care Centers of America, Inc., from October 25, 2016 until he resigned (constructively discharged or wrongfully terminated) on August 31, 2018.

71.    As Social Services Director of Life Care Centers of America, Inc., Mount Vernon facility, Plaintiff performed satisfactorily, with no adverse or disciplinary actions on his employment record while under the direct supervision of his hiring supervisor, Brandon Matrone, MSW., LNHA (Licensed Nursing

QUI TAM COMPLAINT
UNDER SEAL                                    28                     LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # 81-358
Bellevue, Washington 98008
Telephone: (425) 829-6308
E-mail: rp08007@gmail.com

Home Administrator). Plaintiff's responsibilities included:[33] "The Social Services Director plans, organizes, develops, and directs the overall operation of the Social Services department to ensure all medically-related emotional and social needs of patients are met in accordance with all applicable laws, regulations,[34] and Life Care standards."[35]

72.  **Brandon Matrone**, Executive Director of Life Care Centers of America, Inc., Mount Vernon, Washington facility, was Plaintiff's front-line supervisor from on or about October 25, 2018 to on or about May 9, 2018. Administrator Matrone treated Plaintiff with professionalism, respect and dignity and never subjected him to any adverse, abusive or retaliatory conduct at Life Care.

73.  **Nancy E. Butner**, Northwest Regional Vice President and a Licensed Nursing Home Administrator at Life Care Centers of America, Inc., (Mount Vernon facility), was Plaintiff's front-line supervisor (as Interim Executive Director and Vice President -Corporate) from on or about May 10, 2018 to on or about August 31, 2018. Plaintiff alleges that Ms. Butner had direct and/or constructive knowledge of Plaintiff's participation in protected activities, resulting in her subjecting him to a (retaliatory) hostile work environment and retaliated against him for engaging in protected activity. Plaintiff complained about the discriminatory and retaliatory working conditions directly to Ms. Butner, but she

---

[33] Note: On or about 12/06/2016, Human Resources, within Life Care Centers of America, Inc., revised their Social Services Director (SSD) Job Description (Primary).

[34] On or about October 4, 2016, the U.S. Department of Health and Human Services (DHHS) Centers for Medicare and Medicaid Services (CMS) issued revised (final rules) regulations specifying the requirements that long-term care facilities must meet to participate in the Medicare and Medicaid programs, effective November 28, 2016. See: 81 Fed. Reg. 68,688-01 (Oct. 4, 2016). 42 CFR Parts 405, 431, 447, 482, 483, 485, 488, and 489. Accessible online at: Government Publishing Office, at: https://www.gpo.gov/fdsys/pkg/FR-2016-10-04/pdf/2016-23503.pdf.

[35] See: Life Care Centers pf America – Code of Conduct by Forrest L. Preston, Chairman, Life Care Centers of America, Inc. | Life Care Physician Services, LCC. Revised September 2014 – Code of Conduct. Accessible at: https://lcca.com/downloads/Code-of-Conduct-2014.pdf.

QUI TAM COMPLAINT
UNDER SEAL                                        29                        LAKE HILLS LEGAL SERVICES, P.C.
                                                                                          15600 N.E. 8ᵗʰ Street, # B1-358
                                                                                          Bellevue, Washington 98008
                                                                                          Telephone: (425) 829-5305
                                                                                          E-mail: rp78007@gmail.com

took no meaningful action in response.

74.    **Tara Lyn Travers**, Interim Executive Director and a Licensed Nursing Home Administrator at Life Care Centers of America, Inc., (Mount Vernon facility), was Plaintiff's front-line supervisor from on or about mid-May 2018 to on or about August 3, 2018. Plaintiff alleges that Ms. Travers had direct and/or constructive knowledge of Plaintiff's participation in protected activities, resulting in her subjecting him to a (racially/national origin) hostile work environment and retaliated against him for engaging in protected activity. Plaintiff complained about the discriminatory and retaliatory working conditions directly to Ms. Travers, but she took no meaningful action in response.

75.    **Jennifer Kay Scott**, Interim Executive Director and a Licensed Nursing Home Administrator at Life Care Centers of America, Inc., (Mount Vernon facility), was Plaintiff's front-line supervisor from on or about mid-July 2018 to on or about August 31, 2018. Plaintiff alleges that Ms. Scott had direct and/or constructive knowledge of Plaintiff's participation in protected activities, resulting in her subjecting him to a (racially/national origin) hostile work environment and retaliated against him for engaging in protected activity. Plaintiff complained about the discriminatory and retaliatory working conditions directly to Ms. Scott, but she took no meaningful action in response.

76.    **Kelly Falcon**, Vice President –Human Resources Department, Life Care Centers of America, Inc., located in Cleveland, Tennessee. Plaintiff alleges that Ms. Falcon had direct and/or constructive knowledge of Plaintiff's participation in protected activities, resulting in her subjecting him to a (retaliatory) hostile work environment and retaliated against him for engaging in protected activity. Plaintiff complained about the discriminatory and retaliatory working

QUI TAM COMPLAINT
UNDER SEAL
30
LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

conditions directly to Ms. Falcon through Life Care's "Compliance Issue Reporting" an online vendor at: www.LCCA.ethicspoint.com. However, since Plaintiff's utilization of the online processes, he was subjected to additional retaliation resulting in his constructive discharge from Life Care Centers of America, Inc., on August 31, 2018.

77.     Ms. Falcon, Ms. Butner, Ms. Travers, and Ms. Scott all exercised – decisional making authority) direct, simultaneous, or overlapping supervisory authority over Plaintiff (from May-August 2018), resulting in his retaliatory constructive discharge.

78.     Further, Ms. Butner, Ms. Travers, and Ms. Scott also share in the responsibility for subjecting Plaintiff to (various or increasing degrees of hostility and retaliation (with creativity and deceitfulness) –each and every time he exercised his rights to protest discrimination, retaliation, and/or when he engaged in protected activities (i.e., reporting or complaining of Life Care's threatened administrative discrimination or retaliation against women and other ethnic minorities ) for whistle-blowing about the health, safety, and welfare of patients, and other violations of Life Care's Code of Conduct, federal or state rules or regulations, (*i.e.,* HIPPA privacy rules, poor infection controls, etc.,), at Life Care Centers of America, Inc., at the Mount Vernon, Washington facility.

79.     On or about mid-May 2018, Plaintiff requested and was refused access to the "**Blue Book**", from Ms. Butner and Ms. Travers. Specifically, Plaintiff as Director of Social Services is responsible for receiving: comments, complaints, and complements (which is contained on Life Care's "Blue Card" which is an in-house investigative tools for addressing patient concerns which can be completed by patients, immediate and extended family members, staff, and

QUI TAM COMPLAINT
UNDER SEAL

31

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

1  stakeholders).

2

3  **Plaintiff Complaints of HIPPA – Patient Privacy Violations**

4

5     80.    On or about (Saturday) June 16, 2018, Plaintiff worked as Manager

6  of the Day ("MOD"), and upon arriving at work reported to Ms. Travers that the

7  Administrative offices landlines, facsimile lines were reportedly out-of-order.

8  While addressing the issues of dead telephone lines, Plaintiff was ordered to

9  implement the MOD Guide (euphemistically referred to as the "MOD" or "Purple

10 Book") by Ms. Travers who designed and expected its full implementation for

11 managers on weekend and holiday shifts to increase patient admissions.

12    81.    The MOD specifically provides a process –which included the use of

13 the "Weekend Manager To-Do's" ("WMTD") list particially created and

14 implemented by Ms. Travers. Namely, the WMTD is a three-page guide providing

15 the covering manager instructions on accessing Electronic Medical Records (EMR

16 /EPIC Based) internal-and-external to Life Care of the various medical facilities

17 throughout the Puget Sound Region.

18    82.    According to EPIC,[36] there is over two-hundred million patient

19 personal medical records accessible through its web-based software. Major

20 medical providers utilize (EPIC / ePHI) for data-retrieval and storage.

21    83.    The WMTD provides a step-by-step access to prospective patient

22 admissions by accessing (online referral) web-based, patient data information

23 from:

24

25         (a)    Life Care's Admission cellular telephone;
           (b)    Life Care's EMR/Sofcare® and e-mail;
26         (c)    EPIC® Providence;

27

---

[36] EPIC Information accessible online at: https://www.epic.com/about.

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry08997@gmail.com

      (d)     EPIC Skagit Regional Health Clinics;
      (e)     Allscripts ®; and
      (f)     Navi Health. ®

84.   Unfortunately, various local medical hospitals, or other providers allowing Life Care access to its web-portal for accessing the (electronic patient health information) is unaware that various Life Care's managers with no credible basis to have access to sensitive patient data enjoy full and unrestricted access via to ePHI/EPIC.

85.   Plaintiff from June 2018 (and continuing until his discharge from Life Care) continued to complaint to Ms. Butner, Ms. Travers, Ms. Scott, and (effective, August 14, 2018), Ms. Kelly Falcon, Life Care's Corporate Vice President for Human Resources, that Life Care was actively violating patient privacy rights while actively and illegally engaging the WMTD process. Further, Plaintiff also informed his superiors at Life Care repeatedly that he refused to violate the law and access ePHI to illegally access patient private medical records.

86.   In June 2018 (and continuing through August 3, 2018), Ms. Travers accused Plaintiff of not being a team player, and that he was directly hurting Life Care's census by failing to fully implement the WMTD. For example, soon after commencing supervisory authority at LCCMV, Ms. Travers entered my office and directed me to keep my office door (opened and unlocked) during business hours, despite receiving confirmation to the contrary (as reported by me)—that the Department of Social Services (DSS) office(s) were always left closed and locked when not occupied in order to safeguard the medical and mental health records of patients, consistent with LCCA (a HIPPA covered entity governing patient privacy rule), policies and as promulgated by Centers for Medicare and Medicaid also regarding patient privacy rights.

QUI TAM COMPLAINT
UNDER SEAL

33

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007jj@gmail.com

87.     Although the SSD job description includes an expectation that LCCA: "Promotes a culture of integrity, maintains an 'open door' policy, and does not participate in or allow retaliation against those who report good faith concerns," I was permitted from October 25, 2016, through May 31, 2018, considerable discretionary authority to determine the parameters of implementing LCCA's Open Door policy without coercision, specifically relating to keeping the door open or closed. Additionally, the application of the open-door policy as view it has to do with Life Care's policy to create an environment that would faciliate open-ended conversations and/or alternatively to permit individuals to communicate freely about work place concerns.

88.     But when I continued to press Ms. Travers about the unsoundness of keeping the SSD's door open (e.g., with my absence / presence and/or while working on the floor), arguing that it may result in the increase risks of potential breaches of patients' privacy (e.g., I was primarily concerned with the physical documents only, as I had no concern with the digital Electronic Medical Records at that time–believing it to be safe and secure), Ms. Travers immediately dismissed my concerns about the privacy and potential breaches of confidential medical records; instead she reiterated her expectations that my office door would be opened as directed.

89.     While exiting my office –I once again asked Ms. Travers to consider my concerns regarding the security or sanctity of the medical records in my office, she stated:

"…Well your kind of people comes from warm climates, and you guys like to sleep in the afternoons…you know…I am asking for the door to be left opened so that you are not sleeping on the job."

QUI TAM COMPLAINT
UNDER SEAL
34
LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

90.     Perplexed by her comments, I asked Ms. Travers for clarification of her above referenced statement, asking if she had any evidence that I was sleeping on the job. She responded by chuckling and walking away from my office – insisting that I follow her directives.

91.     Further compounding my confusion regarding Ms. Travers' unseemly or cavalier response, Plaintiff began to inquire of is his co-workers (Note: LCCA refers to all employees as "Life Care Associates" "LCA") Caucasian employees, if they were required to also keep their doors unlocked or placed on work related restrictions. My immediate survey of several colleagues confirmed, however, that Ms. Travers never imposed such demands upon them. The consensus amongst some of the LCAs reveals that I was specifically targeted by Ms. Travers and that her behavior toward me was inexplicable and I believed it to be motivated by racial animus.

92.     Soon after receiving the door directives (concomitantly) by Travers and Scott a "Safe" appeared into my office without any explanation provided by anyone in Administration about the circumstances of surrounding storage of the Safe. Upon seeing the Safe at SSD's office, I inquired about the matter with LCC's Environmental and Maintenance Department ("EMD") personnel. The EMD personnel informed me that he was directed to place the Safe in SSD's office without any reason provided by Ms. Travers. The EMD worker just said: "I am following orders."

93.     Plaintiff confirmed later that Ms. Travers ordered the placement of a "Safe" into the SSD office. A maintenance staff –who initially offered to store the Safe in his office under lock and key --was contradicted, and then directed to place the Safe into the SSD's office. I immediately contacted Ms. Travers and notified

QUI TAM COMPLAINT
UNDER SEAL                                    35                    LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry98007@gmail.com

her that (Relator/Plaintiff) was concerned about the Safe being stored into the SSD's office and expressed concerns for the physical safety of the Safe and further informed her that the previous Administrator held the Safe in his office as it contained: financial instruments; check books; credit cards; jewelry; and other miscellaneous, but valuable items belonging to Life Care's patients. Additionally, I explained to both Travers and Scott that the Caucasian women in the Payroll/Business office both had a "Safe" in their offices and that during their absence from their office -while on the floor, their respective doors were always locked –and were not placed under such severe restrictions as me.

94.     Although Relator/Plaintiff expressed concern for the Safe being placed in my office with Travers and Scott, neither was able to provide an adequate explanation for their decision(s) to keep the Safe in the SSD's office. Both Travers and Scott, however, reiterated that the "Safe" belongs in the Social Services Office -as the contents belongs to patients and need be readily accessible –during my absence or presence in the workplace. Note: Ms. Travers did confirm that I did not (and need not) have access or knowledge of the Safe insisted that she is aware that (I) didn't have the secret code to unlock the Safe, further acknowledging that I also did not have possession of the said Safe's inventory list.

95.     During the intervening period between the subjects of the "Door" and "Safe", I was interrupted by Ms. Scott and Ms. Kelly Marler, Business Office Manager insisting that they were going to put "two cigarette lighters" into the Safe. I objected for safety reasons –suggesting that the lighters were filled with gaseous liquid and potentially combustible. Both Marler and Scott dismissed my safety concerns, placed the lighters into the Safe, and walked away from my office.

96.     Subsequent conversations about the same (relating to the Door and

QUI TAM COMPLAINT
UNDER SEAL                    36                    LAKE HILLS LEGAL SERVICES, P.C.
15660 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

Safe) Travers and Scott made another unannounced visit into my office and demanded that the door to the SSD would be left unlocked and opened during business hours. I informed Ms. Travers that her directive effectively would result in medical and mental health records being compromised given that the SSD office was easily accessible by customers, clients, staff, and other professionals —as the office was located immediately adjacent to: the front-lobby at Life Care; the corridor leading to the public access restroom; the copy center; the medical records office, the Business offices; and the Administrative Conference room.

97. Despite numerous protestations to the contrary, I was not able to convince Travers or Scott and ultimately Ms. Butner to changing course regarding the integrity of my office space or the Safe. Having no recourse, I informed Travers and Scott that I would be compelled to file a complaint with the Washington State Department of Labor and Industries ("L & I"), Division of DOSH (Division of Occupational Safety and Health) or with the United States Department of Labor ("DOL"), Occupational Safety and Health Administration (OSHA).

98. Contemporaneously, I also informed Susan Roughton, Social Worker III, Home and Community Services – Washington State Department of Social and Health Services – of my concerns that the Safe contained "gaseous liquid and potentially combustible" materials. Ms. Roughton stated that I had done my best to identify the safety concerns with Life Care's management, and that I should let the process workout itself.

99. Further, on or about late July, both Ms. Travers and Ms. Scott directed my activities —involving a female patient. This direct -hands-on-management of case management of this patient, placed me under direct supervision of both – subjecting me to ridicule, criticism and questioning my social work activities.

QUI TAM COMPLAINT
UNDER SEAL

37

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

Specifically, Ms. Travers demanded that I visit with this female patient alone – despite my having expressed serious concerns surrounding the patient's proclivity for refusing care.

100. Further, I informed Ms. Travers –that "care-in-pairs" for this patient, including my participation in providing social services was necessary –she demanded that (nonetheless) I go into the room alone with the female patient –who also demanded that her room be closed as she prefers the silence and darkness of the room. I informed Ms. Travers that it was inappropriate for me to be forced to meet with a patient alone and in the dark, especially, because she expressed a preference to not to deal with Social Services. (Ms. Travers), nevertheless insisted I should do just that –stating: "Its good customer service." After having complied with Ms. Travers' directive (with a certified nursing assistant) to meet with this patient, I placed an entry note into the patient's chart.

101. The following date after my visit with the female patient, Ms. Scott barged into my office and demanded to know why I had entered an inappropriate note into the above-referenced female patient's chart. Ms. Scott stated: "I am very angry…you now have forced me to have to contact the State of Washington and file a patient report of neglect. Specifically, Ms. Scott construed the language I used –describing the female patient's demeanor was (inappropriate). However, upon further clarification, I informed Ms. Scott that the patient was complaining of lack of a "Welcoming Committee" as she was promised, and that the patient was also complaining about lack of timely pain medications –she was expecting to receive upon her entry into the Life Care.

102. On or about July 31, 2018, during a meeting with Life Care managers, Ms. Scott inexplicably brought up discussions about her intentions to "fire" some

QUI TAM COMPLAINT
UNDER SEAL

38

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

people. I immediately commented that a disproportionate number of single parents and minorities would be the most likely be target for discriminatory or retaliatory conduct by Life Care. I also spoke up and insisted that talking about firing people would create a workplace that may cause workers to not feel safe about complaining about (workplace) safety or likely to report discrimination or retaliation. A medical provider at this meeting also cautioned against creating an environment of fear in the workplace –reiterating that it is very difficult to recruit and retain talent at Life Care.

103.   On or about August 1, 2018, I send an electronic mail (E-mail) to: Ms. Scott (and Dorry Wartchow, Human Resources / Payroll), containing the subject heading: "Concerted / Protective Civil Rights Activities and Court hearings." Specifically, the e-mail message stated:

> "This is to advice you that I will be requiring some time off from my regular work schedule to be determined at a future day to allow my participation (as witness and Plaintiff and as Co-Plaintiff) in Court hearings scheduled in federal and state courts (scheduled in 2018/2019) to specifically address: (1) Civil Rights Discrimination and Retaliation (in employment context under Title VII of the Civil Rights Act of 1964; and pursuant to Washington State Law Against Discrimination (WLAD); (2) Employment retaliation for filing workplace fraud, waste, and abuse –made illegal under the federal and state ((Medicare / Medicaid laws)) pursuant to the False Claims Act ((qui tam)); and (3) OSHA / DOSH violations ((i.e., workplace safety))."

104.   On or about August 1, 2018, at 6:22 p.m., Plaintiff send a text message to his immediate supervisor (Ms. Scott) stating the following:

> "Yesterday at our team meeting you indicated that some people may be fired. Today I felt attacked and humiliated because of an innocent spelling error. Please know that English is not my first language. Yes, I do struggle with the English language, but I try. Can we discuss this issues tomorrow morning after PPS? Thanks. Raju"

QUI TAM COMPLAINT
UNDER SEAL                                    39                    LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rj08007@gmail.com

105.   On or about August 1, 2018, Ms. Scott responded to Plaintiff by text-message:

> "Im sorry raju. I did not know English was not your first language. I was not referring to any of the managers in that meeting. Yes we can discuss tomorrow after grand rounds."

106.   On or about August 2, 2018, at approximately 11:30 a.m., Plaintiff met with Ms. Scott (and Dorry Wartchow, Human Resources/Payroll -was present for the first-half meeting) in her office. Ms. Scott and Plaintiff discussed his concerns involving Ms. Travers' discriminatory (and by extension Ms. Scott's perpetuation of the same) conduct and that Plaintiff needed to report Ms. Travers to Life Care's Human Resources in Cleveland, Ohio.

107.   For what Plaintiff believed was inappropriate and hostile harassment and inexplicable or incoherent conduct toward him and the manner in which he believed she subjected him to discrimination and created a hostile work environment. Ms. Scott provided no relief nor suggested any alternative course to take in order to correct Ms. Travers' and (now, Ms. Scott's) hostile harassment conduct.

108.   On or about August 2, 2018, Ms. Travers --while ending her shift approached me at my office and ordered me to clean the conference room (across from my office) by (Friday) August 3, 2018. Plaintiff immediately advised her that he was not responsible for house-keeping or maintenance related activities (such as painting, cleaning walls, moving furniture, etc.,) she concluded: "Your kind knows how to clean," and while walking away saying: "I better see" this (conference) room cleaned and ready for use "by tomorrow."

109.   On or about August 3, 2018, Ms. Travers ordered Plaintiff (during

QUI TAM COMPLAINT
UNDER SEAL

40

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-8305
E-mail: rjr98007@gmail.com

Managers meeting) to conduct a Care Plan Conference (CPC) with a patient. When Plaintiff informed Ms. Travers that the patient indicated she did not wish to participate, Ms. Travers insisted that the CPC take place –and demanded that he compel the patient's participation. Plaintiff further advised Ms. Travers that forcing the patient to participate in her own CPC was inappropriate, illegal, and inconsistent with Life's Care policy, federal and state policies governing patient rights. She, however, doubled downed and approached Plaintiff again after the meeting –insisting that a CPC was happening –insisting that the patient needs to be discharged from Life Care, advised that she would hold-me personally responsible for failure to complete the CPC –that morning and aggressively seeking the patient's discharge from the Life Care.

110.   On or about August 6, 2018, Plaintiff submitted "Time Off Request" for the Month of August 2018, to Ms. Scott. Incorporated into his request for time off was a statement:

> **"Per my e-mail of 8/1/18 Additional leave request to follow for month of September 2018 ((and future)) for civil rights activities and Court hearings under Title VII / WLAD, FCA, etc." Ms. Scott signed my Time Off Request, clearly having constructive knowledge of my previous and current protected activities whistle-blowing activities, as enumerated in my August 1, 2018, electronic mail."**

111.   On or about August 8/9, 2018, Plaintiff was informed by a Life Care Associate that she discovered (an) illegal entry into Life Care's Sofcare® EMR of a patient's weight (Entry date, August 3, 2018), and that she discovered that there was a large discrepancy (approximately, 90 pounds downward) in the reporting of the weight of the said patient. Further she questioned why Social Services Director would be taking the weight of a patient –as it is out of the scope of his practice.

QUI TAM COMPLAINT
UNDER SEAL

41

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry98007@gmail.com

This Life Care Associate and Plaintiff also caused to file a complaint with Life Care of Centers of America's internal Information Technology ("IT") Department in Cleveland, Tennessee. Plaintiff also submitted a written ticket and placed multiple phone calls to the LCC's IT-system (on August 9, 2018, at 2:51 p.m.), to report the same, and conversely by e-mail and face-to-face reporting to Ms. Scott.

112.   On or about August 9, 2018, this same Life Care Associate –who exposed the serious HIPPA-breach of August 8-9, 2018, reported that she was being subject to retaliation for having brought issues of discrimination and retaliation in the workplace, and for whistle-blowing about the significant breach. Plaintiff once again reported his concerns to Ms. Scott about the LCA's concerns for this worker's ability to remain on the job –as Plaintiff believed her to be a hard worker and dedicated to Life Care for over 13 years –serving as Transportation Coordinator and as Certified Nursing Aide.

113.   On or about August 9, 2018, Ms. Scott's immediate response was to inform me that Plaintiff was to continue to keep his office door open and accessible –in spite his having reported to her and IT of a very serious HIPPA-breach. Plaintiff did, however, continue to remind Ms. Scott of his continued concerns for HIPPA related confidentiality, safety and security of both paper and electronic Patient Health Information.

114.   On or about August 14, 2018, Plaintiff was summoned by (Ms. Nancy Butner) and Ms. Scott to meet with them in the Administrative Conference Room. Ms. Scott handed me a "**Corrective Action Form**" ("CAF") and informed Plaintiff that he was receiving a ("Verbal") warning and requested that he sign the document. Ms. Scott informed Plaintiff that he was responsible (from August 14, 2018 through August 28, 2018) to address the following expectation(s):

QUI TAM COMPLAINT
UNDER SEAL

42

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

**Expectation No. 1**: "Create notes and care plans that meet professional standards, promote resident wellbeing, and adhere to CMS guidelines and expectations.

**Expectation No. 2**: "Follow through on directives from ED and reasonable family requests."

**Expectation No. 3**: "Resolve grievances within 72 hours per Life Care guidelines."

**Expectation No. 4**: "Schedule and hold quarterly care conferences for every resident."

**Expectation No. 5**: "Be an advocate for residents and their family members. Family members should not report to ED that they do not like 'dealing with' the social services director.

115.   Plaintiff inquired about whether there were any plans for increasing staffing for the Social Services Department as Ms. Butner and Ms. Scott reiterated to him he is responsible for all of the operations of the DSS, and yes: "Including purchasing of a "vase" and a "muumuu" and for scheduling transportation, medical, dental, and other appointments for patients. Namely, Ms. Scott confirmed that the Transportation position was being transferred to the DSS, as that service was always under the DSS's responsibilities.

116.   Plaintiff inquired as to the position of the Transportation Coordinator, Ms. Scott responded: ("Ms.____",) will not be returning. Plaintiff concluded that the Transportation Coordinator's position was being terminated because of her active participation in protected activities (i.e., for reporting a significant HIPPA-breach and fraudulent documentation, discriminatory conduct, and for requesting Family Medical Leave Act ("FMLA") to care for her "ailing mother and increasingly available to her daughter.

QUI TAM COMPLAINT
UNDER SEAL

43

LAKE HILLS LEGAL SERVICES, P.C.
15660 N.E. 9th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

117.   Notwithstanding, Plaintiff was reminded (refocused) by both Butner and Scott that his failure to comply with the CAF –would be immediate grounds for dismissal due to his "insubordination." When Plaintiff pressed further if it would be easier to just submit his "resignation," Ms. Butner responded:

**"It sure would make it a lot simpler…"**

118.   After receiving the Verbal warning, Plaintiff expressed grave concerns to both Ms. Butner and Ms. Scott that I was being subjected to the CAF because I filed complaints regarding the health, safety (i.e., threatened DOSH/OSHA reporting), and welfare (of residents –i.e., that Ms. Travers was demanding that I force a patient to participate in a Care Plan Conference ("CPC" meeting); and for providing written notifications regarding pending Title VII / WLAD, FCA complaints/litigations before federal or state Courts;  and for vindicating my civil rights through the federal and state Courts -under the anti-discrimination and retaliation laws and for participating (a False Claims Act) action in order to protect from: "waste, fraud, and abuse."

119.   On or about August 14, 2018, at 4:10 p.m., Plaintiff submitted an electronic mail (E-mail) message addressed Ms. Nancy Butner, Ms. Scott, and Ms. Dorry Wartchow his being "constructively discharged" for exercising his rights to speak about matters of public concern, safety, and engagement in civil rights complaints. Plaintiff closed his message with a request for an emergency meeting to discuss the discrimination / retaliation he was experiencing. This meeting never took place nor was he concerns for retaliation responded.

120.   Further, Plaintiff informed Ms. Butner and Ms. Scott that he believed was also being targeted by Life Care of Centers of America's Management because I engaged in whistle-blowing about the lack of security of the Electronic Medical

QUI TAM COMPLAINT
UNDER SEAL

44

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry98007@gmail.com

Records (EMR); both within and outside of Life Care Centers of America's ePHI records system –nationwide.

121.   Specifically, Relator/Plaintiff reminded Ms. Butner and Ms. Scott that I had filed a verbal and written complaint and work orders through Life Care's "IT" department, including and up to cautioning IT that their EMR-system was compromised, and that Sofcare was not secure and that there was a significant breach of patient record(s).

122.   Relator/Plaintiff also informed Ms. Butner and Ms. Scott of my efforts to place the Safe in a safe area –away from direct patient / professional staff contact with the incendiary items locked in it. Despite coordinating with the Facilities Department to get a safer area for this item, Ms. Scott insisted that it needed to remain in my office. No other similarly situated individual was treated as harshly under similar circumstances, nor required to keep their doors open and unlocked, nor be responsible for equipment that was a safety hazard.

123.   On or about August 14, 2018, Relator/Plaintiff was assigned menial tasks that are outside of my job functions. Ms. Scott ordered me to leave the facility to buy a vase for flowers and lingerie for a patient, despite having raised concerns about pending work-related issues that were not appropriately being address by Respondent.

124.   Furthermore, Relator/Plaintiff became aware of a co-worker who was forced to resign for attempting to report illegal activity to Respondent. Eventually, the work environment had become so hostile that he could no longer continue to subject myself to it and requested a medical leave of absence to avoid further harm.

125.   Relator/Plaintiff was also overly scrutinized by Ms. Scott and Ms. Butner –now being placed on hyper-surveillance at work. For example, on or about

QUI TAM COMPLAINT
UNDER SEAL

45

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry98007@gmail.com

1   August 16, 2018, she attempted to find me insubordinate for "locking" my office,

2   but at the same time contradicted herself by accusing me of leaving my computer

3   on. As such, unless she had access to my office she wouldn't have been able to see

4   whether the computer was on or off. The restrictions would interfere with my

5   ability to complete my workload, as my job requires that he constantly leave my

6   office, and thus would have to turn on and off my computer close to twenty (20)

7   times per day (as documented on or about August 20, 2018), which resulted in my

8   having to leave the office due to the cumulative stress, and the hyper-surveillance

9   of my immediate work station by both Ms. Butner and Ms. Scott.

10      126.   During this intervening period (on or August 16, 2018), Plaintiff

11  requested a letter of reference from his immediate supervisor, Brandon Matrone,

12  who stated:

13

> "Dear Hiring Manager" It's my pleasure to recommend Raju
> Dahlstrom for social services department. Raju and I worked
> together at Life care Center of Mount Vernon skilled nursing
> facility. As a social worker and discharge planner I relied on him
> to promote quality care with dignity and respect for the resident
> and families we served, and to be an advocate for services they
> needed to enhance their daily activities. As part of the
> interdisciplinary team he was an impressive problem solver who
> is always willing to go above and beyond with smile. I
> thoroughly enjoyed my time working with Raju and have come
> to know him as an asset to the residents discharging to the
> community, and those remaining for long-term care. He is
> honest, dependable and incredibly hard-working to ensure that
> services are setup prior to discharge, and the needs are met once
> our residents have returned home. Without a doubt, I confidently
> recommend Raju to join your healthcare team. As a dedicated
> and knowledgeable employee and an all-around great person, I
> know that he will be a beneficial addition to your
> organization…Best wishes, Brandon Matrone, MSW, LNHA,
> Administrator."

25      127.   Plaintiff alleges that he was subjected to a pattern of unequal terms

26  and conditions of employment for engaging in protected activity (and for

QUI TAM COMPLAINT
UNDER SEAL                                    46                    LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

advocating for other Life Care Associates), that resulted in his constructive discharge on or about August 31, 2018. Furthermore, he was subjected to disparaging remarks because of his national origin, that he believed played a role in the disparate treatment.

128.   Relator/Plaintiff notified Jennifer K. Scott, the Interim Executive Director, that he was participating in state and federal court proceedings involving Title VII of the Civil Rights Act of 1964, as amended, among other federal and state statutes. Relator/Plaintiff also consistently raised concerns about policy violations, illegal activity, and the difference in treatment against me, to no avail. After bringing my concerns to Nancy Butner, the Vice President, and whether Relator/Plaintiff was being forced to resign she stated: "it would make it simpler for all of us."

129.   From on or about June, July, August 2018 (and continuing) Relator/Plaintiff has been engaged in protected activities and have utilized both Life Care Centers of America's processes (and external processes) to vindicate the rights of patients, professionals, and my personnel matters –in order to ensure a workplace that is safe from discrimination and retaliation.

130.   On or about August 16, 2018 (and August 17. 2018) Plaintiff notified his immediate supervisor, Ms. Scott that he had to take the extra-ordinary steps to address a patient concern, (i.e., patient forced to defecate, sit in her own urine and feces, and suffer in pain, without timely assistance…further a previous complaint –involving the same set of facts of extreme neglect of patient was reported – namely, that patient's bedpan was parked parallel to her meal tray –implicating serious health hazard, and extreme tortious treatment of a patient) at the Life Care Center.

QUI TAM COMPLAINT
UNDER SEAL

47

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry98007@gmail.com

131.   Ms. Scott, however, ignored my complaint, refused to acknowledge the severity of Plaintiff's documented patient's complaint, instead –taking the opportunity to remind Plaintiff that he was leave his door unlocked and opened during business hours.

132.   Instead she submits a (reminder) notice involving the need for keeping my office door opened in an electron mail message dated: Friday, August 17, 2018, at 6:41 (time-stamped EST, Standard Pacific Time –3:41 p.m.). The e-mail stated:

> **"Raju, you need to keep your door unlocked during business hours as you have been previously instructed or we need to make sure that the business office has a key. When I went into your office just now to get something I printed, your screen was unlocked and unattended and softcare was open. You have been instructed by myself and IT to lock your screen when you leave your desk."**

133.   Relator/Plaintiff was also overly scrutinized by Ms. Scott and Ms. Butner –now being placed on hyper-surveillance at work. For example, on or about August 16 and 17, 2018, she attempted to find Relator/Plaintiff insubordinate for "locking" my office, but at the same time contradicted herself by accusing me of leaving my computer on. As such, unless she had access to my office she wouldn't have been able to see whether the computer was on or off. The restrictions would interfere with Relator/Plaintiff ability to complete my workload, as his job requires that he constantly leave my office, and thus would have to turn on and off the work computer close to twenty (20) times per day (as documented on or about August 20, 2018), which resulted in my having to leave the office due to the cumulative stress, and the hyper-surveillance of my immediate work station by both Ms. Butner and Ms. Scott.

QUI TAM COMPLAINT
UNDER SEAL

48

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

134.   Further, Relator/Plaintiff believe that he was being subjected to illegal (discriminatory/retaliatory) treatment by Ms. Nancy Butner, Regional Vice President for Life Care Centers of America was responsible for providing direct supervision of Ms. Travers and Ms. Scott, for his participation in protected activities and for revealing FCA violations by Life Care Centers of America., Inc., which was in direct contravention to their Settlement Agreement and Corporate Integrity Agreement/Disclosures entered with the United States in 2016.

135.   Additionally, Ms. Butner exercised considerable supervisory authority (along with Ms. Travers and Ms. Scott) over me during all relevant period of this complaint and is responsible for applying work rules or policies *disproportionately* against me, whereas other Caucasian LCCMV managers could operate with impunity.

136.   Relator/Plaintiff believe that he has been subjected to intolerable working conditions when, among other things, Life Care Centers of America failed to take any meaningful action in response to my complaints; failed to take reasonable measures to correct the harassing conduct; target me as a [failed][37] employee; refusal to acknowledge that he was a victim of (trageted discrimnation and retaliation); and condoned and permitted Ms. Butner, Ms. Travers, and Ms. Scott and (through misuse of colleagues, in the present of the highest levels of management, to demean, disparage, and insult him, and to take actions against me —to discourage or prevent him for working in a hostile-free work environment.

137.   This retaliatory conduct created working conditions so intolerable that a reasonable person would have felt compelled to resign. Alternatively, that he

---

[37] During the period between June, July, and August 2018, Respondent actively solicited from staff and patients alike any derogatory information to attack Raju A.T. Dahlstrom, as evidenced in a pre-textual use of an internal survey – performed –ostensibly on call-lights/wait times –where patients complained of waiting over two or three hours, without any pain relief or minimal (timely) assistance to receive "toileting" or "pain" relief.

QUI TAM COMPLAINT
UNDER SEAL                                                   49

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

Relator/Plaintiff find it now impossible to return to work, and subsequently placed under medical care, and for the foregoing reasons, Relator/Plaintiff believe believes he was also subjected to discrimination and retaliation (for his FCA activities) and also he was subjected to conduct due to his national origin, East Indian, and retaliated against for having engaged in protected activity (and whistleblowing about the health, safety, and welfare of residence;[38] and for bringing significant HIPPA breaches to the attention of my employer, and lastly complaining discrimination or retaliation under Title VII of the Civil Rights Act of 1964, as amended.[39]

138.    Relator/Plaintiff acknowledges that his Title VII and WLAD claims are not being litigated in this instant FCA complaint as it is currently under investigation by the United States Equal Employment Opportunity of Commission. He is providing this information to provide full and complete disclosure and for illustrative purposes as to the ongoing discriminatory and retaliatory conduct he experienced at while employed at Life Care Centers of America, Incorporated.

## VIII.  CLAIMS FOR RELIEF

### Count I

### False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)) (previously 31 U.S.C. 3729(a)(1)1986

139.    The Relator repeats and realleges above paragraphs, as if fully set forth herein.

140.    The defendant knowingly presented, or caused to be presented, to an officer or employee of the United States of America, the State of Washington,

---

[38] See also: 81 Fed. Reg. 68,688-01 (Oct.4, 2016).
[39] Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

QUI TAM COMPLAINT
UNDER SEAL
50
LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp99807@gmail.com).

1  Northwest Regional Council ("NWRC"), Government or State of Washington, or

2  its payee-designee, false or fraudulent claims for payment or approval, in violation

3  of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for

4  payment to Medicare or Medicaid, for medically unreasonable, unnecessary and/or

5  other services interventions (under) the Health Homes Programs.

6      141.   Because of the defendant's acts, the United States, et al., sustained

7  damages in an amount to be determined at trial, and therefore is entitled to treble

8  damages under the False Claims Act, plus civil penalties of not less than $5,500

9  and up to $11,000 for each violation.

10

11                          **Count II**

12          **False Statements (31 U.S.C. § 3729(a)(1)(B))**
         **(previously 31 U.S.C. 3729(a)(2) (1986) (Sunrise)**

13

14      142.   The United States repeats and realleges above paragraphs, as if fully

15  set forth herein.

16      143.   The defendant knowingly made, used, or caused to be made or used a

17  false record or statement material to a false or fraudulent claim, in violation of the

18  False Claims Act, 31 U.S.C. § 3729(a)(1)(B), including false Minimum Data Sets

19  utilized by the Sunrise Services, Inc., for billing services –that they knowingly or

20  had constructive knowledge that it was false after Relator complained to Sunrise

21  and NWRC Representative Acosta and Life Care.

22      144.   Because of the defendant's acts, the United States sustained damages

23  in an amount to be determined at trial, and therefore is entitled to treble damages

24  under the False Claims Act, plus civil penalties of not less than $5,500 and up to

25  $11,000 for each violation.

26                          **COUNT III**

27

QUI TAM COMPLAINT
UNDER SEAL                                    51                          LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry88007@gmail.com

**Unjust Enrichment by Sunrise**

145.   The Relator repeats and realleges above paragraphs, as if fully set forth herein.

146.   By virtue of submitting claims to Medicare for medically unreasonable, unnecessary, and unskilled services, the defendant obtained inflated payments from the United States.

147.   Thus, the defendant was unjustly enriched at the expense of the United States of America, et al., in such amounts, as determined at trial.

## COUNT IV

### Payment by Mistake (Sunrise)

148.   The Relator repeats and realleges above paragraphs, as if fully set forth herein.

149.   The defendant submitted claims for Health Homes Program to Medicare, when that level of care was not medically unnecessary. The United States paid more money to maintain the façade that the Health Home Program were beneficial to the detriment of patient(s) entering in and out of their primary resident (Health Homes), hospitals, and skilled nursing facilities (revolving doors) than it would have had the defendant not submitted claims for medically unreasonable and unnecessary rehabilitation or other ancillary supportive services.

## COUNT V

### Conversion (Sunrise)

150.   The Relator repeats and realleges above paragraphs, as if fully set forth herein.

151.   By virtue of the acts described, and specifically by submitting claims and obtaining payment for Health Home Program services that were medically

QUI TAM COMPLAINT
UNDER SEAL                                    52                    LAKE HILLS LEGAL SERVICES, P.C.
                                                                    15600 N.E. 8ᵗʰ Street, # B1-358
                                                                    Bellevue, Washington 98008
                                                                    Telephone: (425) 829-5305
                                                                    E-mail: rp98897@gmail.com

unnecessary, unreasonable, unskilled or otherwise failed to meet Medicare criteria for coverage and payment, Defendant has appropriated the United States' property to its own use and benefit and has exercised dominion of such property in defiance of the United States' rights.

152.   Defendant is, therefore, liable to the United States for actual damages in an amount to be determined at trial.

## COUNT VI

### FCA Retaliation -31 U.S.C. § 3730(h)
### *by Defendants Life & Sunrise*

153.   *Simply restated*: **Patient A** is a pseudonym for a patient –who was alleged to have been subject to neglect at the hands of Relator, upon discharge from the Life Care Center in or around 2017. Specifically, an Adult Protective Services (APS) Social Worker with the State of Washington, Department of Social and Health Services (DSHS) notified Relator in or around November 2017 that he was subject of an investigation –as a result of a referral he received involving Patient A being discharged from Life Care Center of Mount Vernon without adequate resources.

154.   This is despite Patient A having been referred for follow up medical care at the Upper Skagit Tribal Health Clinic, located in Sedro Wholly, Washington. Additionally, Patient A was being assisted with medical services from a provider who is directly related to and FCA-Defendant –who is or was employed at the Sauk-Suiattle Indian Tribe. Further, the DSHS was made a Defendant in a Title VII / WLAD discrimination and retaliation complaint among other things in which the Relator is or was a (Plaintiff along with his spouse) in separate actions pending on federal and state court.

QUI TAM COMPLAINT
UNDER SEAL
53
LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

155. Hence, both Sauk-Suiattle Indian Tribal personnel and DSHS personnel conspired and colluded to facilitate a false allegation report against Relator –which caused significant strain and distress for Relator while employed at the Life Care –as he had to fend off against a false report of "neglect." Ultimately, Relator was notified that he was no longer subject of an investigation by the DSHS/APS in February 2018. Patient A is a pseudonym to provide adequate HIPPA-privacy.

156. **Patient B** is a pseudonym for a patient –who was alleged to have been subject to neglect at the hands of Relator, while Patient B was a patient at Life Care from on or about April to July 2018. Patient B was also alleged to be a victim of Relator –in that upon Patient B's death at a hospital, the Health Homes Care Coordinator and Tia Y. Mathews, an employee of the Department of Social and Health Services, Division of Developmental Disabilities –jointly filed a "whistle-blower" complaint on or about July 2018, with the State of Washington, Department (DOH), alleging Relator was responsible for Patient B's (neglect) resulting in Patient B's death.

157. From on or about April 2018 to Patient B's death, Relator informed the Health Home Care Coordinator and Peter Acosta of Northwest Regional Council (NWRC) of the appropriateness of Patient B's enrollment and continuation of services –given that the services provided by Sunrise Services, Inc., was fraudulent and duplicative. Further, Relator shared his concerns regarding FCA-violations committed by Sunrise to both Acosta and Life Care increasingly in July and August 2018. Relator's concerns regarding the FCA violations were dismissed by Acosta/NWRC and Life Care. As a result of Relator's role in exposing FCA violations by Sunrise and Life Care's apparent dismissiveness –he

QUI TAM COMPLAINT
UNDER SEAL

54

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: ry98007@gmail.com

was rewarded by defending against another "neglect" complains, this time filed by the DSHS and Sunrise personnel –in retaliation for Relator's involvement in protected activities.

158.   The FCA's retaliation provision entitles an employee to relief if he is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against . . . *because of* lawful acts done . . . in furtherance of an action" under the FCA.  31 U.S.C. § 3730(h).

159.   Relator was subjected to retaliation by Life Care and Sunrise after he complained of violations of FCA –namely, the Sunrise's Health Home program was a sham and Life Care's efforts to silence him from vindicating his rights under the FCA provisions.

160.   Specifically, Life Care retaliated against Relator for raising FCA violations in July, August 2018, and was constructively discharged in part for his exercising his rights to complaint about Sunrise's sham activities under the Health Home programs (Medicare and Medicaid funded).

161.   Sunrise knowingly also subjected Relator to false reporting that he contributed to the negligent death of Patient B, and it also injured his ability to be considered for (prospective employment with Sunrise) for his participation in FCA activities.

162.   Further, the FCA imposes liability on organizations that knowingly defraud the government. See 31 U.S.C. § 3729(a)(1)(A)–(B). Because employees are often in the best position to identify and report fraud, the FCA contains a whistleblower provision that protects them from retaliation by these organizations. Id. § 3730(h)(1). This anti-retaliation provision states: Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor,

QUI TAM COMPLAINT
UNDER SEAL

55

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com

or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter. *Id.*

163.   The FCA imposes significant penalties on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the Government or any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B).

164.   Rather than rely solely on federal enforcement of these provisions, Congress decided to deputize private individuals, encouraging them to come forward with claims on behalf of the Government in the form of qui tam suits.   Qui tam provisions are not new to federal law, appearing as early as the first Congress.  J. Randy Beck, The False Claims Act and the English Eradication of Qui Tam Legislation, 78 N.C. L. REV. 539, 554 n.54 (2000).  In fact, the FCA and its qui tam provisions emerged "midway through the Civil War, in response to frauds perpetrated in connection with Union military procurement." Id. at 555.

165.   Under the FCA's qui tam provisions, "a private party, called the relator, challenges fraudulent claims against the [G]overnment on the [G]overnment's behalf, ultimately sharing in any recovery." United States ex rel. Shea v. Cellco P'ship, 863 F.3d 923, 926 (D.C. Cir. 2017); see 31 U.S.C. § 3730(b). The relator may be awarded up to thirty percent of the proceeds ultimately recovered. 31 U.S.C. § 3730(d). Relators need not allege personal injury but instead sue "to remedy an injury in fact suffered by the United

QUI TAM COMPLAINT
UNDER SEAL

56

LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8ᵗʰ Street, # B1-358
Bellevue, Washington 98008
Telephone (425) 829-5305
E-mail: rp98007@gmail.com

States." Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000). The Government may intervene in any qui tam action, taking over from the relator, The FCA provides that a "copy of the complaint . . . shall be served on the Government." Id. § 3730(b)(2).

166.  "The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information." Id. Moreover, the "Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal." Id. § 3730(b)(3). "Before the expiration of the 60-day period or any extensions," however, the Government shall "(A) proceed with the action, in which case the action shall be conducted by the Government; or (B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action."  Id. § 3730(b)(4).

### PRAYER FOR RELIEF

WHEREFORE, the Relator on behalf of the United States demands and prays that judgment be entered in its favor against Life Care and Sunrise as follows:

A.  On the First Count under FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law together with all such further relief as may be just and proper.

B.  On the Second Count under FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law together with all such further relief as may be just and proper.

C.  On the Third Count for unjust enrichment, for the damages sustained and/or amounts by which Sunrise was unjustly enriched or which Sunrise retained

QUI TAM COMPLAINT
UNDER SEAL                                                    57                         LAKE HILLS LEGAL SERVICES, P.C.
                                                                                                    15600 N.E. 8th Street, # B1-358
                                                                                                    Bellevue, Washington 98008
                                                                                                    Telephone: (425) 829-5305
                                                                                                    E-mail: ry98007@gmail.com

and obtained monies to which it was not entitled, plus interest, costs, and expenses.

D. On the Forth Count for payment by mistake, for the amounts by which Sunrise obtained to which it was not entitled, plus interest, costs, and expenses.

E. On the Fifth Count for conversation, for the damages sustained by the United States om an amount to be determined at trial, plus interest, costs and expenses.

F. On Sixth Count for retaliation by Life Care and Sunrise because Relator filed FCA complaints, about Sunrise, Life Care, and against his former employer, Sauk-Suiattle Indian Tribe and against Sunrise for filing false "whistle-blower" complaints with the State of Washington, Department of Health – in order to avoid and distract from their active FCA violations –in their role of collecting monies through the Medicare and Medicaid programs and in its operations of the Health Home programs in general.

G. All other relief as may be required or authorized by law and in the interest of justice.

Respectfully submitted by:

DATED this 23rd day, October 2018

LAKE HILLS LEGAL SERVICES, PC.,

**/s/ Richard L. Pope, Jr.**

RICHARD L. POPE, JR.
WSBA # 21118
Attorney for Relator/Plaintiff
Lake Hills Legal Services P.C.
15600 N.E. 8th Street, Suite B1-358
Bellevue, Washington 98008
Tel: (425) 829-5305 / Fax: (425) 526-5714
E-Mail:  rp98007@gmail.com

***Attorney for Plaintiff Raju A.T. Dahlstrom***

QUI TAM COMPLAINT
UNDER SEAL                                                     58                              LAKE HILLS LEGAL SERVICES, P.C.
15600 N.E. 8th Street, # B1-358
Bellevue, Washington 98008
Telephone: (425) 829-5305
E-mail: rp98007@gmail.com